## 39208. STRICKLAND v. THE STATE.

BELL, Justice.

On May 13, 1982, Strickland was convicted of the murder of his stepfather, Fred Ricks. His motion for new trial was denied on August 25, 1982, and he appeals.

Strickland had been living with his mother and stepfather for three or four months when, on Feb. 16, 1982, he, his stepfather, and a friend, Grady Thornton, spent the morning and part of the afternoon working on the Ricks' home. Both Thornton and Strickland testified that late in the afternoon the three men went to a bar to drink and shoot pool. Strickland and Ricks returned to the Ricks' home about 11:00 p.m. Strickland testified that he and Fred Ricks had not argued during the course of the day.

Mrs. Ricks, Mr. Ricks, and Strickland then talked for about thirty minutes before Mrs. Ricks went to bed. Mrs. Ricks testified that when she left the living room Mr. Ricks was seated on the sofa, and Strickland was seated in a chair adjacent to the sofa and next to her husband. Mrs. Ricks was later awakened by a loud noise. When she went to investigate, she found Strickland standing in the small hallway between the bedroom and the living room. Strickland then told his mother that he had killed Mr. Ricks. Mrs. Ricks saw her husband sitting on the sofa and called the sheriff.

At about 1:30 a.m., an emergency medical technician, Nicholas Jorishie, arrived at the Ricks' home and found Mr. Ricks dead. Jorishie testified that when he asked who shot Mr. Ricks, Strickland replied that he had.

Officers from the GBI and the Pierce County Sheriff's Department arrived shortly after Jorishie. They found Ricks seated on the sofa with his head laid back and his arms lying in his lap. The officers found two spent 12 gauge shell cases, and the only weapon they found was a 12 gauge pump shotgun leaning against the hall wall. Later, during the autopsy, a closed two-inch pocketknife was found in Ricks' overalls.

Dr. Larry Howard of the State Crime Lab testified that Mr. Ricks died of two gunshot wounds to the chest, and he concluded that Ricks was shot from a distance of six to ten feet while in a seated position.

At about 3:00 a.m. the morning of the murder, Strickland gave a statement to GBI Agent Weylon Yeomans. After a Jackson-Denno hearing, this statement was determined to be admissible. Strickland also testified at trial.

Strickland's statement and testimony constitute the only evidence concerning the circumstances of the shooting. Agent Yeomans testified that Strickland recounted the following events: that after Mrs. Ricks went to bed, his stepfather stood up, pulled out a big pocketknife, and stated he was going to cut Mrs. Ricks; that his stepfather then sat down and put the knife back in his pocket, that Strickland told Mr. Ricks he was not going to cut Mrs. Ricks; and that he then got a loaded 12 gauge shotgun from the bedroom, walked back to the hall, and shot Ricks while he was sitting on the sofa.

At trial, Strickland testified that after Mrs. Ricks went to bed, Mr. Ricks said he was jealous of her job and pulled out a pocketknife and said he was going to cut her head off. He testified that, fearing Ricks would carry out his threat, he got his gun and shot Ricks. He testified that he did not know if Ricks was standing or sitting when he shot him; however, he testified that Ricks was sitting and holding an open knife when he went for his gun. In addition, Strickland testified that Ricks never advanced towards Mrs. Ricks' bedroom, and that he did not remember seeing a knife when he shot Ricks.

In addition, Paula Melton, a thirteen-year-old girl, testified that the week before Mr. Ricks was shot, Strickland was at her house and said that he was going to pay back Mr. Ricks for the things he had done to him.

1) Strickland first raises the general grounds, contending that the jury's verdict is contrary to the law and to the evidence. We disagree. After reviewing the evidence in a light most favorable to the jury's verdict, we conclude that a rational trier of fact could reasonably have found Strickland guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Heard v. State,* 248 Ga. 348 (283 SE2d 270)

(1981).

2) In his fourth enumeration of error, Strickland contends that the trial court erred in admitting testimony of his statement to Agent Yeomans. He argues that he was too intoxicated to be able to knowingly waive his right to counsel prior to making the statement. Though Strickland cites no legal authority in support of his position, we have reviewed this contention and find it to be without merit.

At the Jackson-Denno hearing, Agent Yeomans testified that he first advised Strickland of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (86 SC 1602, 16 LE2d 694) (1966), and then explained to him the content of a waiver certificate. In support, the state introduced the waiver certificate, which was signed by Yeomans, Strickland, and another officer, and which attests that Strickland was advised of and waived his constitutional rights. Agent Yeomans also testified that Strickland stated he understood his rights and wanted to make a statement. As to Strickland's intoxication, Yeomans testified that although Strickland had been drinking, he did not appear to be drunk, did not slur his words, and was able to understand him. Strickland offered no evidence concerning his intoxication.

On appeal, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld unless clearly erroneous. *Crawford v. State,* 245 Ga. 89 (2) (263 SE2d 131) (1980). In view of the evidence presented at the Jackson-Denno hearing, we find the trial court was authorized to find that the intoxication of Strickland did not render him unable to make both a knowledgeable waiver of his constitutional rights and a voluntary confession. See, *Fowler v. State,* 246 Ga. 256 (3) (271 SE2d 168) (1980).

3) In his next enumeration, Strickland contends that the trial court erred in admitting photographs of the body of the victim over objection of defense counsel. At trial, nine photographs of the deceased sitting on the sofa were introduced into evidence. Strickland questions the propriety of admitting these duplicative photos; he argues that they served no purpose other than to inflame the jury. While we disapprove of introducing repetitious and cumulative photographs of the victims of crime, see *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Ramey v. State,* 250 Ga. 455 (1) (298 SE2d 503) (1983); *Florence v. State,* 243 Ga. 738, 741, fn. 1 (256 SE2d 467) (1979), we find that it was not error to admit the photos in this case because they are not particularly gruesome and are relevant as illustrating the cause of death and the crime scene. See, *Ramey v. State,* supra; *Moses v. State,* 245 Ga. 180 (6) (263 SE2d 916)

(1980); *Stevens v. State,* 242 Ga. 34 (3) (247 SE2d 838) (1978).

4) Strickland's sixth enumeration of error alleges that the trial court erred in refusing to charge the jury on involuntary manslaughter upon written request. We disagree.

This case is controlled by *Crawford v. State,* 245 Ga. 89 (3) (263 SE2d 131) (1980), which held that in cases involving the intentional discharge of a gun, a charge on either subsection of the involuntary manslaughter statute, OCGA § 16-5-3 (a) (b) (Code Ann. § 26-1103), is not necessary. Accord, *Donaldson v. State,* 249 Ga. 186 (2) (289 SE2d 242) (1982); *Green v. State,* 249 Ga. 369 (4) (290 SE2d 466) (1982). Thus, although Strickland was entitled to and did receive a charge on self-defense and the defense of others, he was not entitled to a charge on involuntary manslaughter. Consequently, the trial court did not err in refusing to give the requested charge.

5) Next, Strickland contends that the trial court erred in not allowing him to cross-examine his mother with respect to specific acts or threats of violence by his stepfather against her. He argues that pursuant to *Milton v. State,* 245 Ga. 20 (262 SE2d 789) (1980), such cross-examination should be allowed since it is relevant to his apprehension of the danger to his mother at the time of the homicide.

Pursuant to *Milton,* Strickland was entitled to introduce evidence of specific acts of violence directed at his mother by his stepfather of which he had knowledge. However, contrary to Strickland's assertions, the record shows that the trial court instructed defense counsel that he could cross-examine Mrs. Ricks concerning such instances of violence. Consequently, we find this argument to be without merit.

6) Strickland's last contention is that the trial court did not give his requested charge on the justifiable use of force in the defense of self or others. However, the charge given by the trial court contained nearly the precise language of the statute (i.e., OCGA § 16-3-21, Code Ann. §§ 26-902, 27-207) and covered the same principles of law as the requested charge. Consequently, this enumeration is without merit. See, *Kelly v. State,* 241 Ga. 190 (4) (243 SE2d 857) (1978); *Pennamon v. State,* 248 Ga. 611 (3) (284 SE2d 403) (1981).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 23, 1983.

*Phillip N. Golub,* for appellant.

*C. Deen Strickland, District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.